IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
FILE NO.: 1:20-CV-250

| | |
|---|---|
| JAMIE ALLEN, et al., | ) **PLAINTIFFS' RESPONSE IN** |
| | ) **OPPOSITION TO DEFENDANTS'** |
| Plaintiffs, | ) **PARTIAL MOTION TO DISMISS** |
| | ) |
| v. | ) |
| | ) |
| CHEROKEE COUNTY, et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| | ) |

Plaintiff submit the following Response in Opposition to Defendants' Motion to Dismiss ("Motion") [Doc. 3].

## INTRODUCTION

For nearly two decades, the Cherokee County Department of Social Services threatened and coerced biological parents to sign Custody and Visitation Agreements ("CVAs") in which they gave up custody of their children without any due process or judicial oversight required by law. When Defendants' actions came to light in 2018, it sparked a series of lawsuits from children/parents who are victims of Defendants' long-running scheme to usurp the authority of the courts and to violate their constitutional rights, *Hogan v Cherokee County et. al,* l:18-cv- 96; *Heaven Cordell v. Cherokee County et. al,* l :20-cv- 201, *Molly Cordell v. Cherokee*

- 1 -

*County et. al,* 1 :20-cv-199; *Godbold v. Cherokee County et al.*, 1:20-cv-202. The County concealed the parents' rights from them, represented that they were acting lawfully, and continued to obstruct parents' access to the courts.

Now that the Defendants' scheme has come to light, the Defendants want the Court to reward them for their skill and success in deceiving the citizens of Cherokee County by dismissing the claims of any person who waited more than three years after signing the CVA to file this lawsuit. In doing so, Defendants urge the Court to ignore Plaintiffs' allegations that Defendants made misrepresentations to them about what they signed and withheld critical information regarding their rights as parents.

Plaintiffs did not know – and could not have known – that they had any legal claims until a judge declared all CVAs invalid in March 2018. Plaintiffs' lawsuit is timely because it was filed within three years of their learning that the CVA was illegal. Further, the continuing wrong doctrine applies, such that the statute of limitations does not begin to run until the constitutional violation ceases. Because Defendants have persisted in violating Plaintiffs' rights to this very day, Plaintiffs' lawsuit is timely.

## STATEMENT OF THE FACTS[1]

Social services employees of Cherokee County, acting under color of state law,

---

[1] All the factual allegations in the Complaint and Amended Complaint are incorporated by reference into this Response.

unlawfully coerced and deceived the Parent-Plaintiffs into signing CVAs at various times between 2004 and 2016. (Doc. 3 at 6-8)   No Parent-Plaintiffs were aware that the CVA was invalid until there were court proceedings in which other CVAs were challenged in March 2018 and all CVAs were declared illegal.  *See generally* Comp. ¶¶ 60-79.  This lawsuit was filed on July 21, 2020.  (Doc. 1-1.)

## ARGUMENT

### I.   THE PARTIES HAVE AGREED TO FILE AN AMENDED COMPLAINT TO ADDRESS PART OF DEFENDANTS' MOTION

Defendants sought dismissal of claims against Jessica Farquar, Michael Mathieu, JS, AR, JB, AuD, and Ad.D.  (Doc. 3 at 9) The parties have conferred and Plaintiffs will file, without objection from the Defendants, an amended complaint that will correct the issues identified by the Defendants regarding these Plaintiffs insofar as they do not concern Defendants' asserted statute of limitations defense.

### II.   STANDARD OF REVIEW

In evaluating whether a complaint should be dismissed under Rule 12(b)(6), "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the Plaintiffs …" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).  "Ordinarily, a defense based on the statute of limitations must be raised by the defendant through an affirmative defense, …and the burden of establishing the affirmative defense rests on the defendant." *Goodman v. Praxair, Inc*., 494 F. 3d 458, 464 (4th Cir. 2007). A

- 3 -

court should not dismiss a complaint under Rule 12(b)(6) unless it clearly appears on the face of the complaint that the claims are time-barred. *See id.* (At the pleadings stage, the Court "generally cannot reach the merits of an affirmative defense, such as the defense that the Plaintiffs' claim is time-barred.") A statute of limitations defense should be litigated during the merits of the lawsuit -- after a factual record has been developed -- and not at the pleading stage. *See, generally, id.*

## III. THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFFS' CLAIMS.

Defendants' argument that the claim of any Plaintiff[2] should be dismissed if the CVA was signed before July 21, 2017 (three years before this lawsuit was filed), ignores Plaintiffs' allegations that the Defendants acted to keep Plaintiffs from discovering their wrongful conduct until 2018 and that Defendants are continuing to act wrongfully toward Plaintiffs, even to this day. All Plaintiffs' claims are timely.

### A. The statute of limitation does not bar Plaintiffs' claims because they have pled the existence of fraud and mistake.

Under federal law, a cause of action accrues when a plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action. *Nasim v. Warden, Md. House of Corr.*, 64 F.3d 951, 955 (4th Cir. 1995); *see also United States v. Kubrick*, 444 U.S. 111 (1979). "In *Kubrick*, the

---

[2] Defendants seek to dismiss the claims of all parent-plaintiffs who signed CVAs before July 1, 2017 and two children-plaintiffs who were minors when the CVAs were signed, but turned 18 before July 1, 2017. The same arguments apply to both categories of plaintiffs, so they are collectively referred to as "Plaintiffs" in this brief.

- 4 -

Court held that for a cause of action to accrue, it is critical that the Plaintiff know that he has been hurt and who inflicted the injury. Once imputed with that knowledge, the Plaintiff is on inquiry notice, imposing on him a duty to inquire about the details of negligence that are reasonably discoverable." *Nasim*, 64 F.3d at 955.

Under North Carolina law, "[t]he cause of action accrues [w]hen the wrong is complete." *Raftery v. Wm. C. Vick Constr. Co*., 291 N.C. 180, 184, 230 S.E.2d 405 (1976); *also see Lee v. City of Fayetteville,* No. 5:16-CV-759-FL, 2017 U.S. Dist. LEXIS 79482 (E.D.N.C. May 24, 2017). However, when the claim is based on fraud or mistake, "the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud or mistake." N.C. Gen. Stat. § 1-52(9).

Plaintiffs' Complaint fits squarely within these rules. Plaintiffs allege facts describing the misrepresentations made to them and the fraudulent context in which they were made:

- No Parent was provided court-appointed counsel or informed of his/her right to consult counsel when presented with the CVA, POA, FSA or substantively similar document. (Doc 1-1, Compl. ¶ 113)

- No Parent voluntarily signed the CVA, POA, FSA, or substantively similar document; the signatures were all obtained by means of deception, fraud, coercion, and duress. (Doc 1-1, Compl. ¶ 114)

- No Social Services employee of Cherokee County informed any Parent that, in a DSS Court proceeding in the North Carolina District Court, that Parent

would have had the assistance of counsel, and that DSS is required by law to attempt to reunify parents who have lost custody of the children in a DSS proceeding. (Doc 1-1, Compl. ¶ 115)

- These false, threatening, coercive, and oppressive statements and omissions overcame each Parent's free will, and he or she signed the CVA, POA, FSA, or substantively similar document under this duress. (Doc 1-1, Compl. ¶ 116)

- Parents were deprived of their rights to substantive due process because Defendants unlawfully took the Minors and deprived Parents of their parental rights by means of the coercive and unlawful CVA. (Doc 1-1, Compl. ¶ 117)

- Parents were deprived of their procedural rights to due process because Defendants' coercive and unlawful use of the CVA deprived Parents of a fair and meaningful opportunity to be heard by a court prior to losing their constitutional parental rights. (Doc 1-1, Compl. ¶ 118)

Plaintiffs allege that this all took place, despite Defendants' being obligated to follow the law and only act in a manner that protects the constitutional rights of parents and children. *See* N.C. Gen. Stat. § 7B-100.[3] The particular manner in which Cherokee County and the other Defendants carried out this scheme led the Plaintiffs to reasonably believe that the CVA process was lawful. The Complaint and

---

[3] In part, the applicable North Carolina law states that a county DSS must:

(3) To provide for services for the protection of juveniles by means that respect both the right to family autonomy and the juveniles' needs for safety, continuity, and permanence; and

(4) To provide standards for the removal, when necessary, of juveniles from their homes and for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents.

N.C. Gen. Stat. § 7B-100(3) and (4).

Amended Complaint contain allegations that Plaintiffs believed that Defendants had the authority to do what they did. (*See* Doc. 1-1, Amd. Compl., ¶¶ 3-9.) At the time each CVA was signed, Plaintiffs trusted the representations of the Defendants, including that they and their agents were authorized by law to do what they did; had Plaintiffs not so believed, they never would have given up their children in this manner. (*Id.* at ¶ 8)

Plaintiffs could not have been aware that Defendants' conduct was illegal until Judge Sellers ruled that all CVAs were unconstitutional on March 14, 2018. (Doc. 1-1, Compl. Ex. E.) Each Plaintiff has affirmatively alleged that he/she did not discover the illegality of the CVA until March of 2018. (Doc. 1-1, Compl. ¶¶ 60-79) Plaintiffs' allegations of the Defendants' misrepresentations are more than sufficient to find that Plaintiffs' claims were filed within three years of when they learned of Defendants' unlawful conduct.[4]

---

[4] The related doctrine of equitable tolling also applies. Under North Carolina law, equitable tolling precludes a statute of limitations defense "when a party has been induced by another's acts to believe that certain facts exist, and that party 'rightfully relies and acts upon that belief to his detriment.'" *Jordan v. Crew*, 125 N.C. App. 712, 720, 482 S.E.2d 735 (1997)" *Lee v. City of Fayetteville*, No. 5:15-CV-638-FL, 2016 U.S. Dist. LEXIS 42366, (E.D.N.C. Mar. 30, 2016). Plaintiffs have alleged at length facts showing how Defendants' fraud and misrepresentations resulted in Plaintiffs (among the poorest and most vulnerable in the population and the least able to take steps to protect her rights) not understanding or being aware that Defendants lacked the authority to carry out their coercive threats. Plaintiffs also did not understand that the Defendants lacked lawful authority to require Plaintiffs to sign the CVA in the first instance. (Doc. 1-1, ¶¶ 133-140.) Because the delay is attributable to the Defendants' deceptive conduct, the statute of limitations was equitably tolled until Plaintiffs was no longer permitted to rightfully rely and act on Defendants' representations, which did not happen until March 2018.
.

Defendants rely on the proposition that the cause of action accrued on the days the Plaintiffs' children were removed from their home, and they cite several cases from outside North Carolina to support this argument. However, the cases on which Defendants rely all involved situations in which the parents were represented by counsel and were afforded due process at relevant times during the process of having their children taken from them. None of Defendants' cases address the circumstances here, where Plaintiffs' families were torn apart with no judicial oversight whatsoever.

The contrast between Plaintiffs' allegations and the law cited by the Defendants is illustrated by *Williams v. Savory*, 87 F.Supp.3d 437 (S.D.N.Y. 2015). There, New York City's Administration for Children's Services ("ACS") removed Williams' children from her on an emergency basis on October 27, 2009. The next day, ACS filed two petitions alleging that William failed to provide her children with an adequate education and proper supervision. Williams had appointed counsel at that hearing. At the next hearing on November 5, 2009, the judge ordered Williams to undergo a mental health evaluation. The court found no issues with that evaluation and released the children to Williams' custody, with ACS supervision, explaining to Williams that "caseworkers can make announced and unannounced visits to your home." *Id.* at 444.

The parties ended up in court again following one of those visits. On December 17, 2009, an ACS worker went to visit Williams' home, but she did not come to the door. Williams also did not answer her cell phone when the ACS worker called. A short time later, the ACS worker returned and saw children through the window of the home and lights on in the home. However, Williams still did not respond to the ACS worker's knocking on the door or repeated phone calls. Police officers were called to the scene and tried without success to get in touch with Williams. Finally, the officers broke down the door to get into the home. They found Williams in the bedroom with two of her children. Williams told them she had taken a pill, fallen asleep, and had not heard anything. ACS determined that the children were at "imminent risk" and should be removed from Williams' custody. The next day, Williams had a hearing and the judge entered an order removing the children from her custody. *Id.* at 444-46.

Unlike the Plaintiffs here, Williams' children were removed pursuant to *legal* process (petitions alleging that the children were neglected) and an emergency hearing on those petitions was held before a neutral judge a day or two later. A lawyer was appointed to represent Williams during all court hearings. Even after the police had to break down the door so ACS could check on the children and Williams was found incapacitated, Williams got a hearing. ACS went back to court and obtained an order removing the children from Williams' custody. At all times,

Williams and her children were afforded due-process protections. *Williams* is an example of how the process works when done legally and a parent has notice of their rights and an opportunity to be heard.

Williams knew immediately that she had been wronged when the police entered her home and took her children away. *Id.* at 454 ("the acts giving rise to Williams' claim were complete when the police officers forcibly entered Williams' home without a warrant, woke her up, and took her children away[; a]t that moment, Williams knew—or at the very least, should have known—of the alleged wrong.") It is logical that the statute of limitations in that case began to run when the children were removed because nothing was hidden -- due process was provided to all parties.

Just the opposite happened in this case. Defendants made a unilateral decision that Plaintiffs' children should be removed from their custody, and they proceeded to make that happen by using a CVA. None of the Plaintiffs went before a judge. None of the Plaintiffs had a court-appointed attorney to represent them.[5] Moreover, under North Carolina law, a parent cannot waive an attorney in a juvenile DSS proceeding unless **the court examines the parent** and makes findings of fact sufficient to show that the waiver is knowing and voluntary. N.C. Gen. Stat. § 7B-602(a1). None of the Plaintiffs were told that they had a right to contest the County's

---

[5] In North Carolina, the Court provisionally appoints counsel for **all** parents when a juvenile petition is filed. *See* N.C. Gen. Stat. § 7B-602(a).

decision. Rather, they were presented with a CVA and were told to sign it without being given an opportunity to consult with an attorney. These factual distinctions are critically important from the cases Defendants cite to this Court. In fact, every single one of the cases cited in Defendants' brief[6] deals with a situation in which the parent had an opportunity to be heard in court and was represented by counsel on the issue of custody or there was no alleged deprivation of due process. *See Kovacic v. Cuyahoga Cnty. Dep't of Children and Family Servs.*, 606 F.3d 301, 307 (6th Cir.2010) (in claims based on the removal of her children by the police, the .plaintiff's **claim accrued on the day the juvenile court magistrate found probable cause** to keep her children in the temporary care of Family Services); *Avelar v. Rodriguez*, No. CV 16-0471-VBF (AGR), 2019 U.S. Dist. LEXIS 125985, at *15 (C.D. Cal. Mar. 25, 2019) ("Plaintiffs' claims . . . stem from . . . DCFS's removal of [Plaintiff's] children on February 22, 2013[;] **Plaintiffs do not allege any acts or omissions by [Defendant] after that date**. Thus, Plaintiffs' federal claims against [Defendant] accrued no later than February 22, 2013."); *Belinda K. v. County of Alameda,* 2011 U.S. Dist. LEXIS 73872, at *6 (N.D. Cal. July 8, 2011) (**A hearing was held two days after a child was removed** from school and placed in foster care.); *Winkler v. Grant*, No. 07-CV-6280T, 2008 U.S. Dist. LEXIS 29062,

---

[6] None of these cases are controlling precedent in this district. It appears Defendants are unable to find a single case with precedential value to support their dismissal arguments under the allegations presented by Plaintiffs. Plaintiffs submit that no such case exists.

- 11 -

at *6 (W.D.N.Y. Apr. 8, 2008) ("The children were removed from the plaintiff . . . December 3, 2003, and **several court proceedings to determine custody were held** . . . during the month of December, 2003.")

Defendants have not cited any case to this Court involving the egregious situation here, where parents are deprived of custody of their children with absolutely no court involvement and government actors lead them to believe that they have no due-process rights. Here, though, the Parent-Plaintiffs did not know and could not know that the Defendants' acts were wrongful at the time they occurred because Defendants cloaked and hid the illegality of their action behind a façade of supposed legality. Defendants excluded Plaintiffs from the court system entirely while unlawfully taking and keeping the children from them as parents. The allegations show that Defendants took advantage of Plaintiffs who did not know their rights, fraudulently obtained signatures on a piece of paper that had no legal value, told the Plaintiffs that the paper was legally binding when they knew or should have known it was not, deceived the Plaintiffs into believing that they had no legal rights, and ensured that they would not have an opportunity to be heard in Court and defend their constitutional right to keep their children.

A case from within the Fourth Circuit (a federal district in Maryland, that is not controlling authority but Plaintiffs contend should be very persuasive) has held consistent with Plaintiffs' position. In *Johnson v. Balt. Police Dep't*, 2020 U.S. Dist.

- 12 -

LEXIS 61052, *65 (D. Md. April 7, 2020) the Court rejected a statute of limitations defense when a *Monell* claim was asserted in 2017 for injuries arising in a car crash in 2010, well outside of the face of Maryland's three year statute of limitations. *Id.* The Court held that because Plaintiffs lacked knowledge that supervisors and policy makers had ratified and authorized the unlawful conduct of the government actors until a court proceeding in 2017, "Plaintiffs could not have had inquiry notice of their § 1983 claims against those Defendants, until 2017." *Id.,* 2020 U.S. Dist. LEXIS 61052, at *66. *Also see Wilson v. Hays*, 228 F. Supp. 3d 1100, 1112-13 (S.D. Cal. 2017) (finding that a plaintiff's *Monell* claim against a police department plausibly accrued later than her § 1983 claim against the individual officer . . . who sexually abused her, because whether Plaintiff simply knew [the officer] 'caused her injury' does not resolve the issue of when her *Monell* claim accrued').

Plaintiffs reasonably relied on the Defendants' misrepresentations because they were government agents who are bound to follow the law. Until March 2018, when a court declared all CVAs unlawful, the Plaintiffs did not know – and could not have known -- that the Defendants had violated their rights.

Ordinarily, the question of when fraud, in the exercise of reasonable diligence, should be discovered is a question of fact for the jury. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 307, 603 S.E.2d 147, 163 (2004). If Defendants have evidence that any particular Plaintiff knew or had

- 13 -

reason to know that the CVAs were unlawful before the court's March 2018 order, then they will have the opportunity to present that evidence at summary judgment and/or at trial. To hold that the statute of limitations has expired at this stage of the litigation would be to hold that the Government could use its power to coerce and deceive individuals into believing that their rights are not being violated and conceal that fact long enough to let the statute of limitations expire. And then the victim is forever deprived of seeking redress. That would be an absurd result and reward the Defendants' deceptive conduct and manipulation of its own citizens. Instead, this Court should find that the discovery rules in *Kubrick* and N.C. Gen. Stat. § 1-52(9) apply, and Plaintiffs' claims are timely.

B. <u>The Statute of Limitations Cannot Bar Plaintiffs' Claims When There Is a Continuing Wrong.</u>

Plaintiffs' claims are also timely because they have alleged that Defendants have engaged in a continuing wrong. Defendants' argument that the statute of limitations began to run on the date each CVA was signed and that this action is untimely for all CVAs signed prior to July 21, 2017 disregards the Plaintiffs' allegations that Defendants' wrongful conduct persisted long after that date. In fact, Defendants continue to violate Plaintiffs' rights to this very day.

When an alleged federal constitutional harm is ongoing, a statute of limitations does not begin to run until the violation has ended. *See Virginia Hosp. Ass'n v. Baliles,* 868 F.2d 653, 663 (4th Cir. 1989) (holding that Plaintiffs' claims

- 14 -

were timely, even though filed outside of the two-year limitation period, because Plaintiffs had alleged ongoing constitutional violations and the statute would not begin to run until the violation ended).  Judge Boyle of the Eastern District of North Carolina recently addressed this issue and held that when, as here, "the substantial deprivation of liberty without due process forms the basis of the claim,[7] the statute of limitations does not begin to run until due process is afforded[, and b]ecause Plaintiffs' alleged harm is ongoing, and there has been no end to his deprivation of liberty without due process, the Court concludes that no statute of limitations bars Plaintiffs' claims." *Grabarczyk v. Stein*, No. 5:19-CV-48-BO, 2019 U.S. Dist. LEXIS 150910, at *10 (E.D.N.C. Sep. 4, 2019) (internal citations omitted).

---

[7] The Plaintiffs' claim under 42 U.S.C. § 1983  is grounded in deprivation of their fundamental constitutional right to family unity, as well as the Defendants' denial of their rights to procedural and substantive due process by closing the courthouse doors to them and preventing them from being heard on whether her child was abused, neglected, or dependent. *See Jordan by Jordan v. Jackson*, 15 F.3d 333, 346 (4th Cir. 1994)

> The forced separation of parent from child, even for a short time, represents a serious impingement on those rights. Similarly, delay implicates the child's interests in his family's integrity and in the nurture and companionship of his parents. *Cf. Parham* v. *J.R.*, 442 U.S. 584, 600, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979) (typically a child's interests are "inextricably linked" with those of the parents);

*Mathews v. Eldridge*, 424 U.S. 319, 333, (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."); *Sansotta v. Town of Nags Head*, 724 F.3d 533, 540 (4th Cir. 2013)

> To succeed on a procedural due process claim, a plaintiff must satisfy three elements. First, he must demonstrate that he had a constitutionally cognizable life, liberty, or property interest. Second, he must show that the deprivation of that interest was caused by some form of state action. Third, he must prove that the procedures employed were constitutionally inadequate. (internal citations and quotation marks omitted)

- 15 -

In *Grabarczyk*, the Plaintiffs was a sex offender, who was required to register in North Carolina solely because of an out-of-state conviction. *Id.* at 2. When he moved to North Carolina in 2005, there was no hearing to determine whether the offense underlying his Wisconsin conviction was substantially similar to a North Carolina offense (which is the standard under which he was required to register in North Carolina). *See id.* at 1-3. In essence, his allegation was that because he had to register as a sex offender without having an opportunity to be heard, he was denied due process of law. *Id.* Plaintiffs filed the lawsuit in 2019, and the state defendants raised North Carolina's three-year statute of limitations as defense, arguing that because the Plaintiffs' claim arose when he moved to the state in 2005, the lawsuit must be filed no later than 2008. *Id.* at 10.

The Court rejected this argument, holding:

> All parties have raised a statute of limitations defense. The statute of limitations for a claim brought under 42 U.S.C. § 1983 is borrowed from the most analogous state law claim. *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 388 (4th Cir. 2014). Where, as here, the substantial deprivation of liberty without due process forms the basis of the claim, the statute of limitations does not begin to run until due process is afforded. *Wallace v. Kato*, 549 U.S. 384, 389, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007). Because Plaintiffs' alleged harm is ongoing, and there has been no end to his deprivation of liberty without due process, the Court concludes that no statute of limitations bars Plaintiffs' claims. *See also Virginia Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989) ("[t]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations").

*Id.* (emphasis added).

- 16 -

Here, Plaintiffs' allegations are similar. The Complaint alleges that they were denied procedural and substantive due process of law when they were coerced into surrendering custody of their minor children by Cherokee County officials acting under color of state law. And they were further deprived of procedural due process of law when Defendants prevented them from being heard before a court. Specifically, Plaintiffs allege that they were deprived of the right to be heard in Cherokee County district court and have a judge determine their fitness as a parent. (Doc. 1-1, Compl. ¶¶ 113-131.) To this day, Cherokee County, through its director of Social Services has never filed a petition to have a hearing on whether a child is abused, neglected, or dependent under North Carolina law. In other words, Plaintiffs' deprivation began on the date the CVA was signed and has continued to the present day.

This ongoing deprivation is particularly egregious, given that Defendants have had ample time to remedy their actions. The illegality of Defendants' acts came to light more than two-and-one-half years ago. (Doc. 1-1, Compl. Ex. E.) The Defendants are the only parties who have the power to remedy this deprivation. *See* N.C. Gen. Stat. § 7B-401.1(a) ("Only a county director of social services or the director's authorized representative may file a petition alleging that a juvenile is abused, neglected, or dependent. The petitioner shall remain a party until the court

terminates its jurisdiction in the case.") [8]  Yet in the decades since Defendants began using CVAs to unlawfully deprive parents and children of due process, the Defendants have done **nothing** to assist Plaintiffs in seeking a judicial determination of whether their children should be taken from them.  Quite the opposite, Defendants have, through the actions described in the Complaint, actively prevented Plaintiffs from having their rights adjudicated by a court of law.  The social services director for Cherokee County had the exclusive power to provide Plaintiffs with the constitutionally required right to be heard by filing a petition.  Instead, Defendants closed the courthouse doors tight and prevented Plaintiffs from having due process of law.  As a result, Plaintiffs suffered the continuing wrong of loss of access to their children child in violation of a state law mandating that Defendants attempt reunification after a child is removed from a parent's custody.  *See generally,* N.C. Gen. Stat. § 7B-906.1.  Further, Defendants' actions have resulted in denial of services for both parents and children when a removal through the court system would have provided them.  (Doc. 1-1, Compl. ¶ 133) This is another set of continuing violations and omissions.

---

[8] The State of North Carolina has designated a special judge to provide hearings for all parents and children who were taken by means of a CVA used by Cherokee County and the other Defendants, but this judge lacks the authority to bring such an action *sua sponte*.  The power to initiate abuse, neglect, or dependency proceedings remains the exclusive authority of the county director of social services under North Carolina law.

- 18 -

Because Defendants did not give Plaintiffs due process when their children were unlawfully removed from their custody[9] – and still have not given Plaintiffs due process today – Plaintiffs (like the class of Plaintiffs in *Grabarczyk*) have pled a continuing deprivation of their rights (a continuing wrong) and their claims are timely.

In that same vein, the North Carolina courts have recognized the "continuing wrong doctrine," which delays the start of the limitations period for state-law claims. The statute of limitations does not start running until the wrongful act ceases. *Marzec v. Nye*, 203 N.C. App. 88, 94, 690 S.E.2d 537, 542 (2010). If the purported violation is the result of "continual unlawful acts," then each act restarts the running of the statute of limitations. *Williams v. Blue Cross Blue Shield of North Carolina*, 357 N.C. 170, 179, 581 S.E.2d 415, 423 (2003). To determine whether a party suffers from "continual unlawful acts" or "continual ill effects," courts must consider "the particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." *Id.*

Looking (as instructed by *Williams*) at "the particular policies of the statute of

---

[9] S*ee Weller v. Dep't of Soc. Servs.,* 901 F.2d 387, 396 (4th Cir. 1990) ("Even if it is constitutionally permissible to temporarily deprive a parent of the custody of a child in an emergency, the state has the burden to initiate prompt judicial proceedings to ratify its emergency action."); *Egervary v. Rooney*, 80 F. Supp. 2d 491, 503 (E.D. Pa. 2000) ("Although there is no bright-line rule for deciding whether a post-deprivation custody hearing is sufficiently prompt, a survey of the case law shows that the delay should be measured in hours and days, not weeks and months.") (citing *Jordan by Jordan v. Jackson*, 15 F.3d 333, 350-52 (4th Cir. 1994)).

limitations in question, as well as the nature of the wrongful conduct and harm alleged," the allegations here allege a series of wrongs, not a single wrong with long lasting harms. The nature of the wrongful conduct is not merely the taking of the minor children from Plaintiffs' lawful custody. The nature of the wrongful conduct necessarily includes the ongoing deprivation of constitutional rights and services. Because of Defendants' deceptive conduct, Plaintiffs did not know they should go to court to challenge the taking of their children until March 2018. Nor were they ever advised that they were eligible for services that would help them become better parents. To this day, Defendants have done nothing to provide Plaintiffs with due process to adjudicate their rights as parents or services to which they are entitled through the DSS system.

None of the cases that Defendants cite support the proposition that the continuing wrong doctrine should not apply in this case.[10] For example, in *Eidson,* the government took children pursuant to a safety plan, filed a petition several months later, and a judge awarded custody to the government. *Eidson v. Tenn. Dep't of Children's Servs*., 510 F.3d 631, 634 (6th Cir .2007). The taking occurred on November 18, 2003, but the father did not file suit until October 25, 2005. *Id.* Tennessee's applicable statute of limitations was one year. *Id.* The court held that

---

[10] None of these cases are controlling precedent in this district. It appears Defendants are unable to find a single case with precedential value to support their dismissal arguments under the allegations presented by Plaintiffs. Plaintiffs submit that no such case exists.

the continuing wrong doctrine did not apply when the limitations period began to run no later than date of the untimely hearing, not several months later when juvenile court restored custody to father and ended its proceedings and any harmful effects resulting from post-hearing actions were merely continuing ill effects, and not acts amounting to continuing violation. *Id.*

There are several reasons why *Edison* is inapplicable. First, there was no deception on the part of the government; nothing was hidden from the plaintiff. *Id.* at 633. Second, the plaintiff received due process of law, being afforded several juvenile court hearings between May 2004 and October 2004. *Id.* at 633-34. But most importantly, the court never considered whether an ongoing deprivation of due process could be a continuing wrong. Plaintiff's procedural due process rights were satisfied when he went to court, not when the adjudication ended Eidson's complaint was untimely under Tennessee law because his deprivation of his procedural due process rights ended more than a year before he filed his Complaint. The case does not discuss what would have happened if he had filed the complaint less than a year before the government filed process and took him to court. That question was never presented to the Sixth Circuit. [11]

---

[11] The rationale in *Edison* actually supports the Plaintiffs' position, not the Defendants'. The Sixth Circuit pointed out:

> "[]n procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty or property' is not itself unconstitutional; **what is unconstitutional is the deprivation of such an**

- 21 -

Defendants fare no better in the other cases they cite because they all involved giving plaintiffs due process. In *Kovacic v. Cuyohoga Cnty. Dept. of Children & Family Servs.*, 606 F.3d 301, 305 (6th Cir. 2010), a complaint for temporary custody was filed the day after the children were removed from the parents. . In *Williams*, as already discussed, a petition was filed and the plaintiff was in court the next day. *Id., supra.* In *Belinda K. v. County of Alameda,* 2011 U.S. Dist. LEXIS 73872, at *6 (N.D. Cal. July 8, 2011), a hearing was held two days after a child was removed from school and placed in foster care. All of these cases stand only for the proposition that when an unlawful taking of a child has occurred **without** a concomitant due process violation, the continuing wrong doctrine does not apply. Defendants do not cite to a single case where the government has systematically deprived multiple families of procedural due process over the course of decades, never remedied that deprivation, and then successfully claimed that the deprivation was not a continuing wrong. Plaintiffs submit that they can find no such case because the premise is fundamentally at odds with the notion of procedural due process. So long as the children were out of their parents' custody and the County refused to file

interest *without due process of law*." *Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) (quoting *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)) (italics in *Zinermon* and bold emphasis supplied by counsel in this memorandum ).

*Eidson*., 510 F.3d at 635 (6th Cir. 2007). Here, the unconstitutional violation continues; the Plaintiffs have not been afforded a hearing or any form of due process.

petitions in DSS court to provide due process, then the deprivation of rights was continuing and the statute of limitations has not begun to run.

Finally, Defendants make the public policy argument that "[c]ouching accrual on when a potential plaintiff finds out something is illegal would eviscerate statutes of limitations, and allow decades old claims to be litigated." (Doc. 3 at 12.) Similar arguments have been advanced and routinely rejected in cases involving plaintiffs who were sexually abused as children and were allowed to file suit long after they became adults. More importantly, an argument that the government, the very entity tasked with protecting the constitutional rights of its citizens, can deprive its citizens of their rights and conceal the truth from its citizens about its conduct, and then claim the benefits of the statutes of limitation if the deceit is not discovered in time, is fundamentally inconsistent with the notion of the rule of law.

## IV. NO "FORFEITURE" CAN APPLY TO THESE PLAINTIFFS' CLAIMS AS A CLASS ACTION OR OTHERWISE.

The doctrine of class action tolling was first announced in the 1974 decision in *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756 (1974), when the Supreme Court held that an applicable statute of limitations is tolled during the pendency of a class action for putative class members or until they "chose not to continue" as a class member, *id*. at 551. At that juncture, the statute of limitations begins running again. *Id*. at 551, 554 ("[T]he commencement of class action

- 23 -

suspends the applicable statute of limitations as to all asserted members of the class who would have been parties has the suit been permitted to continue as a class action.

The Supreme Court has extended the *American Pipe* rule to purported members of the class who later file individual suits rather than intervene. *Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 350, 353-54, 103 S.Ct. 2392, 2397, 76 L.Ed.2d 628 (1983). The basis for this extension is that "[o]nce the statute of limitations has been tolled, it *remains tolled for all members of the putative class until class certification is denied.* At that point, class members may choose to file their own suits or to intervene as plaintiffs in the pending action." 462 U.S. at 354 (emphasis added).[12]

Defendants cite a Maryland district court case to subtly suggest that "[c]ourts within the Fourth Circuit follow the 'forfeiture rule.'" (Doc. 3 at 18.) Not only does that position deviate from the United States Supreme Court's jurisprudence, but the Fourth Circuit also has never adopted such a rule. Instead, the Fourth Circuit Court of Appeals itself has said that *American Pipe* tolling applies to a "subsequently <u>filed federal question action</u> ... during the <u>pendency of a federal class action.</u>" *Wade v. Danek Med., Inc.,* 182 F.3d 281, 286 (4th Cir. 1999) (citing *American Pipe,* 414 U.S.

---

[12] In *Crown, Cork & Seal*, the Court ruled that running of 90–day statutory period within which plaintiff was required to commence his Title VII suit was tolled during the period that there was pending a class action in which he was a putative class member. There, the plaintiff did not receive his notice of right to sue until after the class action was filed, and therefore, he retained a full 90 days in which to bring suit after class certification was denied.

at 552–53) (emphasis added). The majority view from other circuits is that this legal tolling applies to all putative class members even those who "opt-out" or file separate actions during the pendency of the class certification. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1230 (10th Cir. 2008); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008); *In re WorldCom Sec. Litig.*, 496 F.3d 245, 254–56 (2d Cir. 2007) (holding that American Pipe tolling applies to plaintiffs who file actions while class certification is pending); *see also Joseph v. Wiles*, 223 F.3d 1155, 1167 (10th Cir. 2000).

In addition, Plaintiffs do not rely merely on the *American Pipe* tolling doctrine to establish the timeliness of their claims. Instead, as discussed above, the applicable statutes of limitation have not run and the applicable limitations rules require these claims to proceed.

## <u>CONCLUSION</u>

Defendants' Motion to Dismiss should be denied.

Respectfully submitted, this 2nd day of October, 2020.

BY:

THE LAW OFFICES OF DAVID A. WIJEWICKRAMA, PLLC

<u>/s/David A. Wijewickrama</u>
David A. Wijewickrama
N.C. State Bar No.: 30694
95 Depot Street
Waynesville, NC 28786

Phone: 828-452-5801
Fax:   828-454-1990
davidwije17@yahoo.com

/s/ Melissa Jackson
Melissa Jackson
N.C. State Bar No.: 34013
95 Depot Street
Waynesville, NC 28786
Phone: 828-452-5801

*Attorneys for Parent-Plaintiffs*

/s/ D. Brandon Christian
D. Brandon Christian
N.C. Bar No. 39579
3344 Presson Road
Monroe, NC 28112
Phone:  (910) 750-2265
brandon.christian@ncleag.com

/s/ Ronald L. Moore
Ronald L. Moore
N.C. Bar. No. 9619
Post Office Box 18402
Asheville, NC 28814

*Attorneys for Child Plaintiffs*

- 26 -

## <u>CERTIFICATE OF SERVICE</u>

       This is to certify that on October 2, 2020, a copy of the foregoing **PLAINTIFFS' RESPONSE IN OPPOSITION TO PARTIAL MOTION TO DISMISS** was electronically filed with the Clerk of Court using CM/ECF system, which will send notification to all counsel having made appearances in the case as follows:

Patrick Houghton Flanagan
Cranfill, Sumner & Hartzog, L.L.P.
2907 Providence Road
Suite 200
P.O. Box 30787
Charlotte, NC 28230
704-940-3419
704-332-9994 (fax)
phf@cshlaw.com
*Attorney for Defendant Scott Lindsey*
*in his individual capacity*

John L. Kubis, Jr
Teague Campbell Dennis & Gorham, LLP
22 South Pack Square, Suite 800
Asheville, NC 28801
828-254-4515
828-254-4516 (fax)
jkubis@teaguecampbell.com

*Attorney for Defendant Cindy Palmer*
*in her individual capacity*

Sean F. Perrin
Womble Bond Dickinson (US) LLP
301 South College St., Suite 3500
Charlotte, NC 28202
704 331-4992
704 338-7814 (fax)
sean.perrin@wbd-us.com

*Attorney for Defendants Cherokee County,*
*Cherokee County DSS, Scott Lindsey in his*
*official capacity, and Cindy Palmer in her*
*official capacity*

                /s/ D. Brandon Christian
                D. Brandon Christian
                N.C. Bar. No. 39579
                3344 Presson Road
                Monroe, NC 28112
                Telephone:  (910) 750-2265
                Email:  brandon.christian@ncleag.com

                *Attorneys for Child Plaintiffs*